**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **THE GONZALEZ LAW GROUP, PLLC,** | § | |
| Plaintiff, | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:20-cv-1467** |
| | § | |
| **INTERNET LAVA, LLC** | § | **JURY DEMANDED** |
| **& JASON E. MILLER,** | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT
AND APPLICATION FOR TEMPORARY RESTRAINING ORDER,
TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** the Plaintiff, THE GONZALEZ LAW GROUP, PLLC, ("Plaintiff"), and files this Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction against Defendants INTERNET LAVA, LLC, and JASON E. MILLER ("Defendants"), and would respectfully show unto the Court the following:

**I.       INTRODUCTION**

This case arises out of dispute between the parties concerning 2 contracts. The Plaintiff is a Texas law firm based in Houston who hired the Defendants to do 2 things. First, to manage their website and online marketing strategies, promote the law firm's brand and trademarks on the internet, principally using the online search engine Google and others like it. Second, a few months later the Plaintiff decided to hire the Defendants to additional marketing work, specifically to produce 112 videos as a secondary strategy for the online marketing and post those videos on YouTube, Facebook and the law firm's website. Each contract was separate and independent of each other and don't even reference each other. Because of a dispute concerning the second

1

contract for production of videos, the Defendants are now holding Plaintiff's website and internet domain hostage and are fraudulently extorting Plaintiff for payment of more money, extension of the first contract beyond the original term, or else Defendants have informed Plaintiff that the website and the marketing data and materials posted on it will not be returned to Plaintiff, or worse—Defendants have threatened to shut it down and take it off-line completely, something that will produce devastating consequences to Plaintiff's brand and business and irreparable harm. This is especially concerning given the current economic emergency. Plaintiff has over 35 staff members and over 2,500 clients, and so the law firm's website is critical to the law firm's survival. Defendants know this. Because Defendants are committing extortion, by demanding ransom, they are breaching federal and state laws. The parties have attempted to discuss their differences in an attempt to solve their conflicts, but Defendants persist in their extortion efforts.

## II. JURISDICTION AND VENUE

1.      This Court has jurisdiction over the lawsuit because the Plaintiff alleges a claim arising under the laws of the United States. 28 U.S.C. § 1331.

2.      The Court also has supplemental jurisdiction over Plaintiff's claims arising under Texas law, pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this District Court because all or a substantial part of the events or omissions giving rise to the claims arose within this judicial district.

## III. PARTIES

4.      Plaintiff, THE GONZALEZ LAW GROUP, PLLC (hereinafter "GLG"), is a company with principal place of business in Harris County, Texas, and currently conducts business at 8876 Gulf Freeway, Suite 420, Houston, Texas 77017.

5.      Defendant INTERNET LAVA, LLC (hereinafter "IL"), is a for-profit domestic limited liability company, formed under the laws of Texas and doing business in the State of Texas, with its principal place of business and office in 2603 Augusta Dr., Suite 850, Houston, Texas, in Harris County, and IL may be served with citation through codefendant JASON A. MILLER, the President of IL, and who is a 'governing person' of the domestic limited liability company and an agent of the same for purpose of service of process and notice, as permitted by law to be served as such.

6.      Defendant JASON E. MILLER (hereinafter "JEM") is the President and Managing Member of IL, and is himself an individual resident in Harris County, Texas. Based on information and belief, JEM currently resides at 1262 Prince Street, Houston, Texas, and could be served there or wherever he may be found.

## IV. FACTUAL BACKGROUND

7.      GLG is a law firm that provides legal representation to individuals and business in the State of Texas, with the majority of its services being provided in the greater Houston metropolitan area, Harris County and surrounding counties. GLG has assisted clients with legal issues who are not only Texas but in other States, Territories such as Puerto Rico, and other countries, such as Mexico.

8.      The majority of GLG's business is obtained through internet marketing and its website, which internet domain name is: "gonzalezlawgroup.net."

9.      Based on information and belief, GLG is one of the fastest-growing law firms in Texas and the United States.

10.     GLG spends nearly half a million dollars in marketing and promotion efforts every year, and the majority of that investment is directed to internet marketing.

11.     In 2018, the parties in this lawsuit began a business relationship regarding internet marketing efforts to promote GLG's legal services on the internet.

12.     GLG and IL eventually entered into 2 internet marketing contracts with IL, on two separate dates: the first contract was entered into in February of 2018; the second was entered into in November of 2018.

13.     The 2 contracts entered into by GLG and IL are separate and independent contracts, with differing dates, terms and don't even reference each other.

14.     The discussions and negotiations were led by JAM, on behalf of IL, and by Mr. Marco Gonzalez ("Mr. Gonzalez") of GLG.

15.     The first contract was dated February 6, 2018, and it is referred to as the "INTERNET MARKETING PROJECT AGREEMENT" (hereinafter, the "IMPA"). The subject matter or scope of this agreement was, in essence, to entrust IL with the job of assisting GLG's internet daily marketing needs, promotions and internet ad campaigns, and generally to manage GLG's website content ("gonzalezlawgroup.net"). The IMPA had a 2-year term, which is about to expire.

16.     The second contract was entered into much later, and was dated November 27, 2018, and it is referred to as the "VIDEO SERVICES AGREEMENT" (hereinafter, the "VSA"). The stated subject matter or scope of this agreement was  to create a comprehensive "video production package" where IL would produce and create over 100 short videos that would be later posted online to enhance GLG's video marketing efforts on its website, and for "achieving a dominant online presence" for GLG through video content.

4

17.     JAM and Mr. Gonzalez would often hold in-person meetings have numerous telephone conferences and exchange emails concerning these 2 contracts and the progress of the relationship between them, until recently.

18.     An important part of the IMPA was to provide GLG better Search Engine Optimization ("SEO") services to its clients and potential clients, which would help attract higher numbers of clients through the use of internet marketing.

19.     In 2019, Mr. Gonzalez began expressing numerous complaints to JAM concerning delay in IL's performance and defaults concerning IL's inability to timely perform on its contractual terms and conditions.

20.     The contractual disputes between companies concerned both contracts; namely, the general internet marketing and website management agreement, as well as the video production package agreed to in the second contract which, to this date, has not been completed.

21.     GLG has complied with all the payments under the IMPA, the first agreement to date, but the 2-year term of the contract is about to end.

22.     The main disputes concern the VSA, the second agreement they entered into for the creation of the "video production package." GLG paid half of the contract, but has refused to make additional payments because IL and JAM have not complied the full package they promised GLG.

23.     JAM recently threatened Mr. Gonzalez. He told him that if Mr. Gonzalez did not finish paying money on their second contract, the VSA, then he would punish GLG by "taking down" GLG's website and pause any and all other internet marketing and promotions.

24.     If JAM carries out his threat to "take down" the website and refuses to return GLG its login access and complete ownership of its website, which is NOT property belonging to JAM or IL.

5

25.     The telephone threat made by JAM is clearly to keep control over our website as "ransom" or "hostage" to extort GLG out or more money in bad faith. He has now effectively "hijacked" my website beyond what is allowed under contract or the law. In so doing, JAM has exceeded his authorized access, in violation of possession and trade service and tradename rights, and by means of his conduct is intending to commit fraud to obtain more money from my business, way in excess of the $5,400 per month that I have paid him, or the or in excess of the more than $150,000 that I have paid him in the past 2 years. He is intending to illegally use and retain the right to transmit or use our website information, to cause my business severe damages, without my consent, and is knowingly committing fraud in using to my exclusion passwords and access codes, or similar information, intentionally exceeding his authority. His telephone communication to me was a clear threat to cause damage in order to extort and illegally obtain more money.

26.     JAM had the clear intent to extort me and my law firm for more money when, during our phone call, he demanded payment of money he has not lawfully or contractually earned, or else he would ensure causing permanent damage to the data on GLG's website and completely stop its operation on the internet (causing 'site downtime'). His ultimate goal: get paid or cause irreparable damage to the website and the site's SEO Google ranking disrupting the law firm's ongoing operations and growth (to facilitate his extortion).

27.     GLG's trademarks are distinctive and famous as it is one of the fastest growing law firms in the United States. In 2017, GLG was invited to attend the "Law Firm 500" legal conference in Florida, a conference where the fastest growing law firms are acknowledged and celebrated.

28.     In 6 years, GLG has grown to become a famous law firms and has already helped handle over with over 4,200 clients from numerous parts of the United States, Mexico, South America and Puerto Rico.

29.     GLG has spent millions of dollars to make its trademarks distinctive and famous, especially to the online consumers.

30.     The phrase "Your Legal Team for Life" is a famous mark that GLG uses to promote its business, including on the internet.

31.     The GLG logo is also a famous and distinctive mark that GLG uses to promote its business, including on the internet.

32.     In fact, Defendants cater primarily to law firms and lawyers, and often acknowledged that GLG was one of its biggest and most important clients.

33.     By holding GLG's website hostage, and demanding ransom, Defendants are engaging in cyberpiracy and using GLG's trademarks illegally, without authorization and unfairly.

## V. CONDITIONS PRECEDENT

34.     All conditions precedent to the filing of this lawsuit have been satisfied, waived, or otherwise performed.

## VI. FEDERAL CASUES OF ACTION

### FIRST CAUSE OF ACTION: FEDERAL COMPUTER FRAUD AND ABUSE - 18 U.S.C. § 1030(a) & (g)

35.     GLG has suffered losses by reason of Defendants mishandling its website, and failure to comply with their duty of loyalty, and will likely suffer irreparable losses and damages if JAM carries out his extortion threat of "taking down" GLG's website, if GLG does not give in to his demand to extend the term of the contract and/or pay IL more money.

36.     Defendants risk losing more than $100,000 if JAM carries out his computer fraud extortion scheme, perhaps even millions of dollars.

37.     Defendants have exceeded their authority and authorized access by engaging in a fraudulent extortion scheme, in order to obtain more money by way of an extension to the current IMPA, and by way of obtaining additional payments under the VSA, when no such contractual extension or payments are warranted legally or contractually.

38.     If JAM carries out his fraudulent extortion threat of "taking down" GLG's website, he will be need to knowingly and maliciously enter certain password codes and commands, so as to intentionally cause damages to GLG's domain, website, trademarks, goodwill, business reputation and efforts, against GLG's authorization and interests.

39.     By making fraudulent extortion demands, the Defendants are pursuing a quid pro quo that carries a clear intent to defraud by trafficking or monetizing the passwords and data through which GLG's website and website data may be accessed, affecting interstate commerce.

40.     When making said fraudulent extortion demands, the Defendants have clearly made a "demand or request for money or other thing of value" (*i.e.*, extension of term of IMPA) "in relation to" the irreparable damage they will cause to GLG's website, trademarks, goodwill, business reputation, etc., and clearly such damages will be caused in order "to facilitate" their fraudulent extortion scheme, which should not be allowed by this Court, but rather be punished.

41.     Federal law establishes that any person who suffers damage or loss by reason of a violation of the Federal Computer Fraud and Abuse Act may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. 18 U.S.C. § 1030(a) & (g).

42.     GLG's website and domain name (which in turn contain its trademarks) are critical digital assets that are contained, stored and administered in high speed data processing devices, such as computer servers, which are all protected under federal law.

43.     The Defendants current mismanagement of the these digital assets and the expressed threat of "taking them down" from the internet to carry out the purposes of their extortion is clear evidence that they are acting without authorization or in excess of authorization, or exceeding the authority, for an improper purpose, which is to commit intentional fraud and extortion.

44.     In fact, **Paragraph 9, subsection B of the IMPA** specifically states as follows:

(b) *Return of Materials.* Upon expiration of this Agreement and upon full payment of the contract price of **$51,821.00** (fifty-one thousand eight hundred twenty one dollars and no/100 cents) IL will promptly deliver to CLIENT all source code, documents, data, records, and other information obtained from CLIENT or created by IL for CLIENT prior to or during the Contract Period and all Confidential Information provided to IL hereunder. IL shall not retain any documents or data, or any reproductions or excerpts of any documents or data, which contain or pertain to any Confidential Information.

45.     Furthermore, **APPENDIX A of the IMPA**, paragraph 11, clearly expresses that GLG owns the website and that it must be returned to GLG with proper access data, web hosting data and website data, as follows:

11)   **Client Ownership:** Client already owns the current version of the website, full ownership of the website including new additions and the entire internet marketing package will be given to client at the conclusion of this agreement, this includes:
  a)   Transfer of any domain name registrations to client's personal domain registrar account.
  b)   Furnishing all source files that were used to create the website and other online marketing materials.
  c)   Entire website on a disc including database and all files necessary for the website to full function hosted through a different web hosting provider. At client's request, an HTML version will be provided.
  d)   Login access and complete ownership of each social media profile and each directory submission created on client's behalf.

46.     The main purpose of internet domain names and websites is to identify the entity that owns the web site, and that a domain name and website that mirrors a corporate name is one of the most valuable assets a company can have, as it facilitates communication with a customer base.

47.     Defendants are acting like pirates who hold GLG's website and domain name hostage in order to use it as a pirate's booty and fraudulently traffic or negotiate these goods to obtain more loot.

48.     If the Defendants carry out their extortion threat, they will cause a significant impairment or damage to the integrity of GLG's business reputation and website data.

49.     The Defendants are violating federal law because, even though they had authorization to manage GLG's website and web data, they have now exceeded that authority and are acting illegally by engaging in misconduct -in fact in criminal conduct- by committing extortion, using property and assets belonging to GLG, in violation of their duty of loyalty that agency law imposes on them.

50.     The Defendants actions are causing reasonable costs to GLG, and may cause more losses if GLG's website is "taken down" and GLG has to restore or reconstruct it, or even re-initiate it, causing interruption of services. All of GLG's losses relate to the impairment of GLG not having full and adequate control over its website at this time (because Defendants are not being responsive to GLG or its best interests) or by the interruption of services GLG will soon suffer, if the Court does not protect GLG from Defendants.

## SECOND CAUSE OF ACTION: FEDERAL ANTI-CYBERPIRACY VIOLATIONS

51.     Defendants have also engaged in cyberpiracy holding GLG's website and the use of GLG's trademarks, which appear prominently on the website.

52.     In addition to the domain name which has a personal name (gonzalezlawgroup.net), GLG has at least 2 protected trademarks on its website. It's logo with a

"G" imposed over 4 colored squares next to the name "THE GONZALEZ LAW GROUP," and

the phrase "YOUR LEGAL TEAM FOR LIFE!" as follows:



53.     GLG's trademarks are distinctive and famous as it is one of the fastest growing

law firms in the United States. In 2017, GLG was invited to attended the "Law Firm 500" legal

conference in Florida, a conference where the fastest growing law firms are acknowledged and

celebrated. In 6 years, GLG has grown to become a famous law firms and has already helped

handle over with over 4,200 clients from numerous parts of the United States, Mexico, South

America and Puerto Rico.

54.     In fact, Defendants often acknowledged that GLG was one of its biggest and most

important clients.

55.     By holding GLG's website hostage, and demanding ransom, JAM and IL are

engaging in cyberpiracy and using GLG's trademarks illegally, without authorization and

unfairly.

56.     The Anticybersquatting Consumer Protection Act (ACPA), contains a provision

called "cyberpiracy prevention," 15 U.S.C. § 1125(d), which states that "[a] person shall be

11

liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person …has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and … traffics in … a domain name that … is identical" to the owner's mark.

57.     The bad faith is clear in this case because JAM and IL are not only openly extorting GLG for more money, but also the Court can see that the domain name in this case is, in fact, the legal name of the person or a name that is otherwise commonly used to identify that person; namely: THE GONZALEZ LAW GROUP.

58.     Defendants are clearly acting in bad faith and illegally by "trafficking in" a domain name (gonzalezlawgroup.net) that … is identical to the owner's mark because they are seeking an exchange for more money, which is additional consideration that was actually owed under the IMPA.

59.     Cyberpiracy is at play here because the domain name and website contain Plaintiff's trademarks or tradenames and Defendants are holding them ransom in exchange for money. That is precisely why Congress enacted 15 U.S.C. § 1125(d).

60.     It is well known that a domain name is the simplest way of locating a web site, and if a computer user does not know a domain name, they can use an Internet search engine such as Google or Yahoo. Those search engines penalize businesses that allow their websites to go offline, which can cause damages to businesses.

61.     Plaintiff is entitled to statutory damages in the amount of $100,000 because Defendants are engaging in extortion and said conduct is criminal in nature, and is therefore "a willful violation."

12

62.     In a case involving a violation of section 1125(d), the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just. 15 U.S.C. § 1117(d).

63.     Plaintiff is further entitled to prejudgment interest and attorney's fees, which are hereby requested, for Defendants' conduct and violations. 15 U.S.C. § 1117(a) & (b).

64.     In short, it is beyond clear that the Defendants are acting in bad faith with an intent to illegally profit money by keeping in their possession GLG's website, and using it for extortion.

### VII. CLAIMS UNDER TEXAS LAW –
### SUPPLEMENTAL JURISDICTION

### THIRD CAUSE OF ACTION: BREACH OF CONTRACT (*IMPA*)

65.     Plaintiff, GLG, incorporates all of the allegations in the proceeding paragraphs as set forth here in full.

66.     The four elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance, or tendered performance, by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach.

67.     The parties entered into a the IMPA on February 6, 2018 for a 2-year term. The stated purpose and scope of the IMPA was for IL to develop "a comprehensive web package that includes all necessary steps to achieving a competitively dominant online presence," which will be attained by maintaining "a high level of search engine visibility in Google, Yahoo, Bing and other search engines." The IMPA also provided that there would be a Search Engine Optimization campaign that would "target competitive positioning and high rankings on the three search

engines." In consideration for these internet marketing services, GLG would pay a total of $154,950 in 2 years.

68.     Performance by the Plaintiff. GLG has made EVERY PAYMENT owed under the IMPA, fully complying with its contractual duties. The IMPA provides that GLG would pay a total of $154,950 at the end of the 2-year term; specifically by making a down payment of $30,750 and then paying the remaining balance of $124,200 in 23 monthly installments starting June 1, 2018. And GLG has made ALL of its payments during the 2-year term of the contract.

69.     Plaintiff has already paid in full under the terms of the IMPA—Plaintiff has paid IL a total of $154,950 to IL.

70.     Paragraph 3 of the IMPA is crucial. It specifically acknowledges that during the two-year contract period, GLG "shall retain ownership of the domain name *gonzalezlawgroup.net* which IL shall develop and maintain for the exclusive use of" GLG. (IMPA, para. 3). And more importantly, "[u]pon the conclusion of the two year contract period and payment of the full contract amount[,] complete ownership of the website and all source files developed by IL shall be transferred to CLIENT [GLG]." (*Id*.). Paragraph 3 of the IMPA states that: "Any social media profiles, directory listings, local business or map listings, or other online profiles created by IL for the sole purpose of promoting CLIENT [GLG] shall be the sole property of the CLIENT the moment it is created."

71.     Paragraph 9, subsection B of the IMPA specifically states as follows:

(b) *Return of Materials.* Upon expiration of this Agreement and upon full payment of the contract price of **$51,821.00** (fifty-one thousand eight hundred twenty one dollars and no/100 cents) IL will promptly deliver to CLIENT all source code, documents, data, records, and other information obtained from CLIENT or created by IL for CLIENT prior to or during the Contract Period and all Confidential Information provided to IL hereunder. IL shall not retain any documents or data, or any reproductions or excerpts of any documents or data, which contain or pertain to any Confidential Information.

72.     Defendants have not returned the materials promised to Plaintiff under Paragraph 9, subsection B of the IMPA.

14

73.     APPENDIX A of the IMPA, paragraph 11, imposes certain duties on IL to return digital data and property belonging to GLG and IL has already indicated it will NOT comply with. It acknowledges that GLG is the owner of the website and that control over it will be returned to GLG at the conclusion of the contract term, as follows:

11)  **Client Ownership:** Client already owns the current version of the website, full ownership of the website including new additions and the entire internet marketing package will be given to client at the conclusion of this agreement, this includes:
   a)  Transfer of any domain name registrations to client's personal domain registrar account.
   b)  Furnishing all source files that were used to create the website and other online marketing materials.
   c)  Entire website on a disc including database and all files necessary for the website to full function hosted through a different web hosting provider. At client's request, an HTML version will be provided.
   d)  Login access and complete ownership of each social media profile and each directory submission created on client's behalf.

74.     Defendants have informed that they will not comply with these duties to return said digital data and property belonging to GLG, unless additional money payments are made to Defendants.

75.     Defendants are extorting GLG for more money, before it complies with its contractual duties, even though GLG has already paid IN FULL the money owed under the IMPA.

76.     Worse yet, JAM has illegally threatened that he will be "shutting down" the website being managed by IL under the IMPA, unless GLG gives into Defendant's demands for more money.  That is a clear violation of the covenants stipulated in the IMPA.

77.     Furthermore, the Defendants have admitted to GLG that they mismanaged the website in numerous ways, causing damages to the website's content, pages and ranking, which has caused GLG damages and continues to cause damages. In doing so, IL has failed to comply with its contractual agreements under the IMPA.

78.     Defendants have caused GLG damages as a result of the violations of the terms of the IMPA.

**FOURTH CAUSE OF ACTION: BREACH OF CONTRACT (*VSA*)**

79.     Plaintiff, GLG, incorporates all of the allegations in the proceeding paragraphs as set forth here in full.

80.     Existence of a Valid Contract. On November 27, 2018, entered into a second contract known as the "VIDEO SERVICES AGREEMENT" or the "VSA" to create a comprehensive "video production package" where IL would produce and create approximately 112 short videos that would be later posted online to enhance GLG's video marketing efforts on its website.

81.     Furthermore, Appendix B & C of the VAS specify how many videos would be produced and delivered to GLG, a total of 112, as follows:

**APPENDIX B – Ten (10) Master Promotional Videos**

1. Project includes a four-day shoot (up to 8 hours per day) and editing of ten (10) engaging and captivating, high-end productions (2-4 minutes in length)
2. Five (5) videos in English and five (5) in Spanish
3. These videos will focus on the attorney/firm's experience and commitment to excellence. Will also focus on demonstrating legitimacy and authority in the firm's practice areas
4. Will include 1-2 client testimonials each, as well as b-roll / footage of the office, story establishing shots, etc.
5. All necessary stock video and stock music will be included

**APPENDIX C – One Hundred (102) Practice Area Videos**

1. One hundred and two (102) niche practice area videos: videos (30-120 sec in length)
2. All necessary stock video or stock music will be included
3. Includes editing and producing each video
4. During the allotted four-day shoot, our goal will be to capture as much raw footage as possible so that additional practice area videos can be produced at a future date without the need for additional shooting

82.     To date, the Defendants have only produced 55 of said videos.

83.     Even though Defendants have only produced about half of the videos promised under the VAS, it is demanding that Plaintiff pay more money under the contract.

84.     Defendants do not want to give any assurances to Plaintiff that it will produce all 112 of the videos, or a certain date to do so.

85.     Plaintiff only has paid IL approximately half of the money owed under the VSA, because it has only received half of the promised videos.

86.     Plaintiff has informed Defendants that it is willing to pay all the money owed under the VSA when additional videos are produced, or at least when a certain date is determined for them to be produced.

87.     Defendants have already failed to comply with deadlines stipulated by the parties for these additional videos.

88.     Plaintiff no longer trusts Defendants, especially now that that they are using extortion as a means to obtain more money without even them delivering additional videos to Plaintiff, as stipulated in the VSA.

89.     IL has breached the VSA completely.

90.     Appendix D of the VSA specifies the quality and use of said videos, as follows:

**APPENDIX D– *Video Lava* Optimization and Distribution**

1.  All videos will be optimized and implemented into the firm's website using *Video Lava* technology
2.  Videos will be posted to the website as soon as production has concluded
3.  Users will be able to share and embed the videos directly from the firm's website (instead of just from YouTube)
4.  Users will be able to leave comments directly on the firm's video pages on the website
5.  Keyword research (we determine what questions/search terms people are searching for in respect to your practice areas in your targeted geography - so we can create content based on what is getting the most searches)
6.  Video optimization (titles, descriptions, tags)
7.  On-page optimization (proper embed code so Google can accurately crawl your videos)
8.  Mobile optimization (includes an alternative, smaller file video that loads when a mobile device is detected)
9.  Search Engine Optimization for videos to show up in Google search results. Primary goal will be for the firm's website to show up in video search results. Videos will also be uploaded to YouTube, LinkedIn, and other platforms as needed for optimization

91.     Furthermore, IL has not complied with optimizing all videos and embedding the videos in different pages of the website, as the parties agreed to, or in a way that allows Search Engine Optimization for videos to show up on Google search results, as stipulated in Appendix D.

92.     Paragraph 7.1 of the VSA stipulated that the total budget for this contract was: $140,000.

93.     Paragraph 2 of the VSA provided the terms of payment, as follows:

2. **Payment Terms.** In consideration for the SERVICES, CLIENT shall pay IL a total of **$140,000.00** (one hundred forty thousand dollars and no/100 cents) over an 18-month period, financed at 0.0% interest. A down payment of **$70,000.00** (seventy thousand dollars and zero cents) will be collected in multiple payments as follows: **$35,000.00** (thirty-five thousand dollars and no/100 cents) will be collected upon acceptance of this agreement, followed by 4 consecutive monthly payments of **$8,750.00** (eight thousand seven hundred fifty dollars and zero cents) beginning **January 1, 2019**. The remaining balance of **$70,000.00** (seventy thousand dollars and zero cents) will be paid in 14 monthly installments of **$8,750.00** (eight thousand seven hundred fifty dollars and zero cents) with the first monthly installment being due on **August 1, 2019**, or after 3 master promo videos and 50 practice area videos have been produced as outlined in the appendices, whichever is later. If at least 3 master promo videos and 50 practice area videos have not been produced by **September 1, 2019**, IL will produce an additional 5 practice area videos per month at no extra cost to CLIENT.

94.     Plaintiff has paid for the 55 videos that it has received from IL.

95.     GLG has not paid more money to IL under the VSA because IL has not complied with its part of the bargain, and has failed to complete the 112 videos in full, or give a certain date to do so.

96.     IL is in clear violation of its part of the VSA.

97.     GLG has complied with its part of the agreement so far.

98.     IL's breach of contract under the terms of the VSA has caused GLG damages and continues to cause it damages.

## FIFTH CAUSE OF ACTION: TRADEMARK DILUTION OR TARNISHMENT

99.     Plaintiff, GLG, incorporates all of the allegations in the proceeding paragraphs as set forth here in full.

100.    The primary focus of traditional trademark law is protection of the consumer from deception and deceit.

101.    However, unlike the traditional cause of action under trademark law, dilution protects not the consumer but rather the value of the trademark to the trademark holder.

102. Dilution refers to a diminishment in the ability of a distinctive or famous trademark to identify and distinguish goods and services carrying that mark.

103. Dilution focuses not on the protection of the consumer from confusion (the *traditional* objective of trademark infringement law), but upon protection of the trademark asset in the hands of the trademark holder.

104. In 6 years, GLG has grown to become a famous law firms and has already helped handle over with over 4,200 clients from numerous parts of the United States, Mexico, South America and Puerto Rico.

105. GLG has spent millions of dollars to make its trademarks distinctive and famous, especially to the online consumers.

106. The phrase "Your Legal Team for Life" is a famous mark that GLG uses to promote its business, including on the internet.

107. The GLG logo is also a famous and distinctive mark that GLG uses to promote its business, including on the internet.

108. In fact, Defendants cater primarily to law firms and lawyers, and often acknowledged that GLG was one of its biggest and most important clients.

109. By holding GLG's website hostage, and demanding ransom, Defendants are engaging in cyberpiracy and using GLG's trademarks illegally, without authorization and unfairly.

110. If Defendants are successful in taking down or taking off-line GLG's website, as they have threatened using fraudulent extortion, Plaintiff's trademarks will be diluted.

111. By filing this lawsuit Plaintiff seeks to protect its famous and distinctive brand and trademarks from being illegally diluted.

112.    If consumers can't find GLG's website when searching online, as most consumers now do, it will also tarnish the strong image and brand that GLG has built for itself in the legal market, weakening its position in the market for legal services. This will cause it irreparable harm.

113.    Defendants are in violation of the Texas Anti-Dilution Act, because through their acts and omissions, and their threats, they are causing injury to GLG's business reputation, Texas Business and Commerce Code § 16.103.

**SIXTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY**

114.    Plaintiff, GLG, incorporates all of the allegations in the proceeding paragraphs as set forth here in full.

115.    In Texas, the elements of a breach of fiduciary duty are: '(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant.

116.    A fiduciary relationship existed between Plaintiff and Defendants by virtue of their business relationship, as specified in the IMPA and VSA contracts.

117.    The relationship between Plaintiff and Defendants used to be a relationship of trust and confidence.

118.    As part of that fiduciary relationship, Plaintiff entrusted Defendants with its most important assets: control, use and management of its website, internet domain name, use of its trademarks and strategy for online branding.

119.     It is clear that Defendants have breached the trust and confidence and are no longer working to favor or benefit Plaintiff, but to cause damage to Plaintiff.

120.     Plaintiff no longer trusts Defendants.

121.     Defendants have openly breached the fiduciary duty to the Plaintiff, and their breach is causing damages to Plaintiff, in violation of Texas law.

## SEVENTH CAUSE OF ACTION: CONSTRUCTIVE FRAUD

122.     Plaintiff, GLG, incorporates all of the allegations in the proceeding paragraphs as set forth here in full.

123.     Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary relationship.

124.     Because Defendants have breached the fiduciary duty they owed to Plaintiff, and are now openly criminally extorting Plaintiff, they are now also committing fraud, in violation of Texas law.

## EIGTH CAUSE OF ACTION: TEXAS THEFT LIABILITY ACT

125.     Plaintiff, GLG, incorporates all of the allegations in the proceeding paragraphs as set forth here in full.

126.     The Texas Theft Liability Act provides a civil remedy against a "person who commits theft ... for the damages resulting from the theft." Tex. Civ. Prac. & Rem. Code § 134.003(a).

127.     The statute defines theft as "unlawfully appropriating property" as described by the Texas Penal Code. Id. § 134.002(2).

128.    Plaintiff alleges that Defendants' actions qualify as a violation of Texas Penal Code sections 31.03 and 31.05. Section 31.03 deals with simple theft: "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code § 31.03.

129.     It is clear that Plaintiff's domain name, website, and the data and materials on it are property of GLG, and not property belonging to Defendants.

130.    Defendants have a contractual and fiduciary duty, under Texas law, to return to Plaintiff these items, and to do so "promptly."

131.    Plaintiffs have made repeated demands for return of its property to no avail.

132.    Defendants have not returned Plaintiff's property, as explained in these pleadings.

133.    Defendants are both in breach of the Texas Penal Code and the Texas Theft Liability Act.


**NINTH CAUSE OF ACTION: UNJUST ENRICHMENT / RESTITUTION**


134.    Plaintiff, GLG, incorporates all of the allegations in the proceeding paragraphs as set forth here in full.

135.    Plaintiff alleges that Defendants have been unjustly enriched by their continued retention and control of GLG's website and trademarks and brand, and because they feel they have these valuable assets in their control and possession feel entitled to continue to enrich themselves unfairly and unjustly by extorting Plaintiff for more money and by making demands that have never been agreeable to Plaintiff.

136.    Defendants are committing theft and fraud.

137.    Defendants feel emboldened to take undue advantage of Plaintiff.

138.    In Texas, a plaintiff may recover under an unjust enrichment theory when the defendant has obtained a benefit by fraud, duress, or the taking of an undue advantage.

139.    Because of this, Plaintiff is entitled to recovery of damages for unjust enrichment.

140.    More importantly, Plaintiff is entitled to restitution of its assets which Defendants are illegally withholding to enrich themselves illegally and unjustly.

### VIII. APPLICATION FOR TEMPORARY RESTRAINING ORDER

141.    Plaintiff has fully complied with all necessary preconditions and requirements for the court to issue a Temporary Restraining Order ("TRO").

142.    Plaintiff will be filing a separate motion for TRO, with supporting statement under penalty of perjury, the contents of which are fully adopted by reference herein for all purposes, pursuant to Fed.R.Civ.P. 10(c).

143.    Plaintiff has properly identified the person and entity to be restrained: Defendants.

144.    Plaintiff has explained herein and in other pleadings why the TRO should be issued, and why the Court should do so *ex parte* in this particular case; namely, because if Defendants find out about this lawsuit, and what is alleged and pled herein, they will immediately execute acts to fulfill their threat to "take down" or bring down or off-line, GLG's website. If they do so, the damage will be done and Plaintiff will be irreparably harmed, which is why Plaintiff is urgently seeking the Court's aid.

145.    The failure to issue a TRO will certainly cause Plaintiff irreparable injury.

146.    Additionally, because no damage or harm will be caused to the Defendants by issuance of TRO, and given the urgency and COVID-19 emergency, we respectfully request that the Court waive the bond requirement at this time.

## IX. REQUEST FOR TEMPORARY INJUNCTION

147.    Plaintiff asks the Court to set his application for temporary injunction for a hearing and after the hearing, issue a temporary injunction against Defendants. The reasons are explained herein and in other pleadings, which are fully adopted by reference herein for all purposes, pursuant to Fed.R.Civ.P. 10(c).

## X. REQUEST FOR PERMANENT INJUNCTION

148.    Plaintiff asks the Court to issue a permanent injunction after a full trial on the merits against Defendants. Also, the reasons supporting permanent injunction. The reasons are explained herein and in other pleadings, which are fully adopted by reference herein for all purposes, pursuant to Fed.R.Civ.P. 10(c).

## XI. ATTORNEY'S FEES

149.    Request is made for all costs and reasonable and necessary attorney's fees incurred by or on behalf of Plaintiff.

## XII. JURY DEMAND

150.    Plaintiff hereby demands a trial by jury.

## XIII. PRAYER

**WHEREFORE PREMISES CONSIDERED**, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon final trial that Plaintiff be awarded

equitable orders to protect its rights under federal and state law, and a judgment against the Defendants, for the following:

        a.      Temporary Restraining Order

        b.      Temporary Injunction

        c.      Permanent Injunction

        d.      Actual Damages

        e.      Special Damages

        f.      Exemplary Damages

        g.      Prejudgment and post judgment interest at the maximum rate

        h.      Attorney's Fees and Court Costs

        i.      All other relief to which Plaintiff may be entitled at law or in equity, whether pled or unpled.

        Respectfully submitted,

        **THE GONZALEZ LAW GROUP, PLLC**

        By: */s/Kevin Acevedo*
        Kevin Acevedo
        USDC Bar No. 2932922
        The Gonzalez Law Group, PLLC
        8876 Gulf Freeway, Suite 420
        Houston, TX 77017
        Ph. 832-530-4070
        Fax. 832-530-4090
        Email: kevin@gonzalezlawgroup.net

        **ATTORNEY FOR PLAINTIFF**